**THIS ORDER IS SIGNED AND ENTERED.**

**Dated: March 31, 2022**



**Hon. Rachel M. Blise**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re: | |
| Palace Theater, LLC, | Case No. 21-11714rmb |
| Debtor. | Chapter 11 |

### DECISION AND ORDER DENYING KRAEMER BROTHERS, LLC'S MOTION TO CONVERT CASE TO CHAPTER 7 AND SUSTAINING KRAEMER BROTHERS, LLC'S OBJECTION TO SUBCHAPTER V ELIGIBILITY

Before the Court is a motion filed by creditor Kraemer Brothers, LLC to convert this chapter 11 case to one under chapter 7. Together with its motion, Kraemer Brothers has also filed an objection to the debtor's eligibility to proceed under subchapter V of chapter 11.

For the reasons set forth herein, the Court denies Kraemer Brothers' motion to convert and sustains Kraemer Brothers' objection to the debtor's eligibility under subchapter V.

**I.**

Palace Theater is a dinner theater venue in Wisconsin Dells. Palace Theater, LLC (the "Debtor") owns the real estate and building where the theater is operated. Until August 16, 2021, 94 North Productions, LLC ("94 North") operated the dinner theater business. 94 North is owned by the same persons, and in the same proportions, that own the Debtor.

As the Debtor has explained it, there are two aspects to running a dinner theater.  The first is production of the shows put on at the theater.  That involves determining which shows to run, locating and contracting with performers, selling tickets, and providing lights, sound, and related theatrical amenities.  The second is the "hospitality" operation – the food, beverage, and other concessions available during the shows.  That involves setting menus, ordering the food and beverage, preparing the food, and serving it during the shows.

On June 27, 2014, the Debtor executed a promissory note in favor of Kraemer Brothers in the principal amount of $3,525,000.  The note is secured by a mortgage on the real estate.  The same day, the Debtor and 94 North entered into a Lease Agreement whereby the Debtor leased the real estate to 94 North.  Under this arrangement, the Debtor owned the real estate and conducted no other activities while 94 North operated the theater business, running both the show production operations and the hospitality operations.

Few, if any, payments were made under the Lease.  The Debtor carried the accrued arrearage under the Lease on its books, reporting losses each year.  On its schedules, the Debtor listed an account receivable owed by 94 North in the amount of $1,696,750.63.

The payments due from 94 North under the Lease mirrored the payments due to Kraemer Brothers from the Debtor under the note and mortgage.  The Debtor made few payments to Kraemer Brothers (likely a result of itself receiving few payments from 94 North under the Lease), and on July 7, 2021, a foreclosure judgment was entered in Sauk County, Wisconsin Circuit Court.  A sheriff's sale was scheduled for August 17, 2021.

On August 16, 2021 (the "Petition Date"), the Debtor filed a voluntary chapter 11 petition and elected to proceed under subchapter V of chapter 11.  On the Petition Date, but before the petition was filed, the Debtor and 94 North entered into a Purchase and Sale Agreement whereby

the Debtor purchased from 94 North "[a]ll furniture, fixtures, equipment, and inventory of [94

North] related to food and beverage operations." The sale was subject to all liens and

encumbrances. The purchase price was $267,475, which the Debtor financed through a

promissory note in favor of 94 North. The Debtor also agreed that beginning on August 16,

2021, it would "pay all payroll and employee-related expenses related to the hospitality

operations." The record does not indicate that 94 North transferred any other assets to the

Debtor on or before the Petition Date, such as lighting and sound equipment or performer

contracts, or that the Debtor assumed any other of 94 North's liabilities.

On October 14, 2021, Kraemer Brothers filed a motion to convert this case to one under

chapter 7. Kraemer Brothers also objected to the Debtor's eligibility to proceed under

subchapter V of chapter 11, arguing that the Debtor's primary activity on the Petition Date was

the business of owning single asset real estate.

The Court held an evidentiary hearing on the motion on January 28, 2022. The Court

heard testimony from Anthony Tomaska, the principal owner and manager of the Debtor; Mac

Rowland of Harney Partners, a financial consultant retained by the Debtor; and Ron Bero, an

expert witness retained by Kraemer Brothers.

Mr. Tomaska testified regarding the operations of the Debtor and 94 North. He said that

the Debtor and 94 North had agreed on or about August 11, 2021 to transfer certain assets and

operations from 94 North to the Debtor. He did not execute the documents to formalize the

transfer or take any other action with respect to the transfer until August 16, 2021. On that day,

he signed the Purchase and Sale Agreement on behalf of both the Debtor and 94 North, and he

informed the theater staff that "everything then on would be under purview of the Palace

Theater."[1]  Aside from the exhibits discussed below, Mr. Tomaska did not elaborate on exactly

what the Debtor's operations, as opposed to 94 North's operations, were on the Petition Date or

the days that immediately followed.

The Debtor submitted two exhibits related to the Debtor's operations before, on, and after

the Petition Date.  Exhibit 101 listed all shows held at the theater between August 10, 2021 and

November 29, 2021.  The exhibit indicates that no shows were held on the Petition Date.  The

first show held after the Petition Date was Bello Nock, who performed on August 20-22 and

August 27-29.  Exhibit 101 indicates the performances were "show only," which Mr. Tomaska

testified means no meal was served during those shows.

Exhibit 102 listed the Debtor's gross revenue by date between August 11, 2021 and

November 30, 2021.  There are three columns, one for "show only," one for "dinner & show,"

and one for "bar & concession."  Based on Mr. Tomaska's testimony, the Court understands that

the first two columns represent advance ticket sales for future shows (and may perhaps include

same-day ticket sales), and the last column represents food and beverage sales during shows held

on that day.  Revenue is listed in the columns for "show only" and "dinner & show" for each

day, meaning that there were advance or same day ticket sales each day.  Mr. Tomaska testified

that the physical box office at the theater is open 7 days a week, and that there is an online

platform for patrons to purchase tickets.

Exhibit 102 indicates that the first day after the Petition Date that any bar & concession

sales were made was August 31, 2021.  Mr. Tomaska testified to his belief that concession items

---

[1] Mr. Tomaska testified to his belief that "all the operations of the theater," including all of 94 North's assets and
liabilities, were transferred from 94 North to the Debtor on the Petition Date but before the petition was filed.  The
Purchase and Sale Agreement contradicts this testimony because it relates only to the "hospitality" assets and
operations.  Accordingly, the Court does not credit Mr. Tomaska's testimony on this particular point.

were available during the Bello Nock show, but he had no knowledge of how those sales, if any, were accounted for in Exhibit 102.  The record is clear that no shows were held on the Petition Date, and no bar and concession sales were made on that day or any day until at least August 20, 2021, when the first Bello Nock show was held.

The Debtor's monthly operating report for August 2021 suggests that all August revenue for the theater, whether for ticket sales or bar & concession sales, was deposited in the first instance in an account held by 94 North.  *See* ECF No. 40 at 22-27.[2]  There is no evidence in the record as to when or whether any revenue received from theater operations in August 2021 was transferred to the Debtor.

Mr. Tomaska also testified as to the Debtor's business strategy.  When the theater first opened, 94 North, as the operator of the theater, staged large musical-theater type productions that required significant investment, including researching and procuring rights to a show, recruiting and paying performers, and obtaining and maintaining elaborate sets.  The theater was not able to operate profitably using this model.  Since approximately 2018, 94 North has pursued a different strategy.  It now fills most of the schedule with "pre-packaged" shows where the performers come with their own material, music and sets.  This type of show requires less investment, which Mr. Tomaska believes will allow the theater to be more profitable.  Mr. Tomaska testified that the theater has not had the opportunity to fully test the new strategy because the theater was shut down beginning in March 2020 due to the Covid-19 pandemic.  Since reopening in summer 2021, the theater has continued to pursue the new business strategy.

---

[2] The bank statement for the 94 North operating account includes a deposit nearly every day from a payment processing service.  ECF No. 40 at 22-27.  The only bank account in the name of the Debtor has just three deposits for the month of August 2021, none of which appear to have originated from the 94 North operating account into which the daily revenue appears to have been deposited.  ECF No. 40 at 15-17.

Mr. Tomaska testified that before the Petition Date he combined the books and records of 94 North and the Debtor, and he has continued that practice since the Petition Date. From the Debtor's monthly operating reports, it appears that the revenue for both the production operations and the hospitality operations is deposited into an account in the name of 94 North. Other than the supposed transfer from 94 North to the Debtor of the hospitality-related equipment and operations, and Mr. Tomaska's instruction to staff that some or all of the operations would be conducted by the Debtor instead of 94 North, it is unclear how, if at all, the operations of the theater or the business of the Debtor changed on or after the Petition Date.

The Debtor filed a chapter 11 plan on November 15, 2021, which was amended on February 18, 2022. The plan calls for the operations of 94 North and the Debtor to be formally merged into a single entity.

Mac Rowland of Harney Partners testified as to the Debtor's revenue projections for the theater and the combined operations of the Debtor and 94 North. He opined that the Debtor will be able to operate profitably and without the assistance of government grants. To support his conclusion, he consulted several theater industry professionals regarding the Debtor's plan to pivot the theater's business away from traditional musical theater productions to shows that are less expensive to produce. Mr. Rowland testified that the Debtor's losses since the Petition Date were to be expected and that, as of January 28, 2022, the Debtor's gross profit was only approximately $50,000 behind his projections. He testified that he expects attendance to increase in the busy summer months in the Wisconsin Dells, which he says will allow the Debtor to become profitable.

Ron Bero testified on behalf of Kraemer Brothers as to his projections regarding the theater operations and revenue. Mr. Bero reviewed the finances for the Debtor and 94 North for

the last several years.  Using that information, he determined that the Debtor would not be able

to operate profitably in the future.  Mr. Bero did not adjust his projections based on the debtor's

new business strategy, nor did he consult theater industry professionals.  His opinion was based

solely on the Debtor's past financials, most of which were the result of a business strategy the

Debtor does not intend to pursue.

The Court took the matter under advisement at the conclusion of the hearing.  On March

28, 2022, the Court delivered an oral ruling.  This decision memorializes and expands upon that

oral ruling.

## II.

Section 1112(b) of the Bankruptcy Code provides that "the court shall convert a case

under [chapter 11] to a case under chapter 7 or dismiss a [chapter 11 case], whichever is in the

best interests of creditors and the estate, for cause . . . ."  11 U.S.C. § 1112(b)(1).  The statute

contains a nonexclusive list of conditions that constitute "cause."  *Id.* § 1112(b)(4).  Kraemer

Brothers bases its motion on one of the enumerated conditions – "substantial or continuing loss

to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  *Id.*

§ 1112(b)(4)(A).  Kraemer Brothers also asserts that the case should be converted because it was

not filed in good faith.  *See In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).

As movant, Kraemer Brothers bears the burden to prove by a preponderance of the evidence that

there is "cause" for relief under § 1112(b).  *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir.

1994).

## A.

Kraemer Brothers first argues that there is cause to convert this case because there has

been substantial or continuing loss to or diminution of the estate and there is no reasonable

likelihood of rehabilitation.  11 U.S.C. § 1112(b)(4)(A).  This statutory ground for demonstrating

"cause" requires the presence of both elements. *In re Original IFPC S'holders, Inc.*, 317 B.R.

738, 742 (Bankr. N.D. Ill. 2004).

The first element is met if the debtor incurred continuing losses or maintained a negative

cash flow position. *In re Schriock Constr.*, 167 B.R. 569, 575 (Bankr. D.N.D. 1994); *see also In*

*re Gateway Access Sols., Inc.*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007) ("Negative cash flow

and an inability to pay current expenses as they come due can satisfy the continuing loss or

diminution of the estate standard for purposes of § 1112(b).").  The Court concludes that

Kraemer Brothers has met its burden on the first element because the Debtor has experienced

continuing losses and has not operated at a profit since the beginning of the case.  The Debtor's

monthly operating reports, which combine the Debtor's finances with those of 94 North[3], reveal

the following:

- August 2021 – negative net cash flow of $199,522.73, ECF No. 40 at 2

- September 2021 – negative net cash flow of $87,895.15, ECF No. 57 at 3

- October 2021 – negative net cash flow of $14,500.57, ECF No. 71 at 2

- November 2021 – positive net cash flow of $361,709.32, ECF No. 98 at 2

- December 2021 – negative net cash flow of $155,631.13, ECF No. 146 at 2

- January 2022 – negative net cash flow of $69,643.98, ECF No. 174 at 2

The only month in which the Debtor's income exceeded its expenses was November

2021.  In that month, 94 North received a substantial government grant related to the Covid-19

---

[3] Since the beginning of the case, the Debtor's monthly operating reports have combined the Debtor's finances with those of 94 North.  The Court continues to question the propriety of this reporting method, particularly because it is unclear how much of the losses in the reports are attributable to the operations of the Debtor, as opposed to those of 94 North.  No party has raised an issue with the form of the Debtor's monthly operating reports, nor has any party argued that the Court should not consider the figures in those reports in connection with Kraemer Brothers' motion.

pandemic.  94 North immediately transferred $450,000 of those funds to the Debtor.  Without the

grant funds, the Debtor's cash flow for November 2021 would have been negative.

What is more, at the end of January 2022, the Debtor had just $130,760.66 in cash on

hand.  ECF No. 174 at 2.  On March 18, 2022, the Court entered an order approving over

$240,000 in interim professional fees.  ECF No. 196.  On March 8, 2022, applications for over

$100,000 in additional professional fees were submitted.  ECF Nos. 176-179.  It is unclear how

the Debtor will pay those fees given that it is not earning enough income each month to cover its

ordinary expenses.

The Debtor has survived only through a significant grant awarded to 94 North.  The

business itself is not currently profitable, and the estate is diminishing with each passing month.

Accordingly, the Court has no trouble finding that Kraemer Brothers has established that there

have been substantial and continuing losses to the estate.

For the second element, Kraemer Brothers must establish that there is no reasonable

likelihood of rehabilitation.  The issue of "rehabilitation" for purposes of § 1112(b)(4)(A) "is not

the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's

business prospects justify continuance of the reorganization effort."  *In re LG Motors, Inc.*, 422

B.R. 110, 116 (Bankr. N.D. Ill. 2009) (internal quotation omitted).  Kraemer Brothers argues that

the Court should not permit the Debtor to continue its reorganization effort because it has no

prospect of operating a business sufficiently profitable to fund a plan.  In support of its assertion,

Kraemer Brothers presented the testimony of financial expert Ron Bero.  As noted above, Mr.

Bero's projections are based on the Debtor's historical performance, much of which includes a

business strategy the Debtor is no longer pursuing.

The Court cannot find that Kraemer Brothers carried its burden to prove there is no reasonable likelihood of rehabilitation. Though the Debtor currently is not operating profitably, there is at least some evidence that the Debtor may be able to do so in the future. Mr. Rowland credibly testified on behalf of the Debtor that the theater's new business model will bring in more revenue, particularly once the summer tourist season begins.

Kraemer Brothers argues that Mr. Rowland's projections are too speculative, rendering liquidation the only option. But the cases that Kraemer Brothers cites for this argument are distinguishable. In *In re Schriock Construction, Inc.*, 167 B.R. 569, 576 (Bankr. D.N.D. 1994), the debtor's plan was not feasible because it made no provision for expenses like interest, income tax, or materials. Kraemer Brothers has made no such accusation in this case. In *Quarles v. United States Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996), the debtor filed no plan of reorganization and believed that pending litigation would have a favorable result and cure his financial ills. Here, the debtor has filed a plan of reorganization, and while the plan does count on receipt of certain grant funds, their receipt is far less speculative than the litigation in *Quarles*. In *Johnston v. Jem Development Co. (In re Johnston)*, 149 B.R. 158, 162 (9th Cir. 1992), the court noted that the debtor lacked sufficient income to fund a plan, and the bankruptcy court believed it "critical" that the debtor's common carrier certificate was subject to revocation. There are no such "critical" circumstances in this case that would prevent the Debtor from earning income. In *In re Continental Holdings, Inc.*, 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994), the debtor had not shown it would receive income from any source. The Debtor here has an ongoing business that is generating revenue every month.

The Debtor has a stable source of income that is not speculative. The only uncertainty identified by Kraemer Brothers is whether the Debtor's income will be sufficient going forward

to fund the plan that it has proposed.  At this stage, the Court cannot say Mr. Rowland's

projections are so inaccurate or speculative that the Debtor has no chance of reorganization.

**B.**

Kraemer Brothers next argues that cause exists to convert this case to one under chapter 7

because the Debtor did not file this case in good faith.  Although not listed in the statute, "cause"

for conversion also includes want of good faith.  *In re Sparrgrove,* 313 B.R. 283, 288 (W.D.

Wis. 2004); *see also In re Madison Hotel Assocs.*, 749 F.2d 410, 426 (7th Cir. 1984) ("It is

generally recognized that 'good faith' is a threshold prerequisite to securing Chapter 11

relief, . . . and that the lack of such good faith constitutes 'cause,' sufficient for dismissal under

11 U.S.C. § 1112(b).").

Good faith is a nebulous concept that is often difficult to define precisely.  *See In re

Smith*, 848 F.2d 813, 817 (7th Cir. 1988) ("A comprehensive definition of good faith is not

practical.").  "Courts generally consider the totality of circumstances surrounding a variety of

objective and subjective indicators."  *In re Original IFPC S'holders, Inc.*, 317 B.R. 738, 750

(Bankr. N.D. Ill. 2004).  "The inquiry often centers around the debtor's bona fide need for a

breathing spell to reorganize."  *Id.*  "The clearest case of bad faith is where the debtor enters

chapter 11 knowing that there is no chance to reorganize his business and hoping merely to stave

off the evil day when the creditors take control of his property."  *In re James Wilson Assocs.*, 965

F.2d 160, 170 (7th Cir. 1992).  A bankruptcy court should look at the totality of the

circumstances and ask if there is a sincere effort of repayment.  *In re Schaitz*, 913 F.2d 452, 453-

54 (7th Cir. 1990).

Kraemer Brothers' argument as to the Debtor's bad faith rests entirely on *In re Phoenix

Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988).  In that case, the debtor owned an apartment

complex development that likely would have been characterized as single asset real estate under

§ 101(51B) had that definition been in the Bankruptcy Code when the debtor filed its petition.

The debtor filed on the eve of foreclosure, and the bankruptcy court concluded that the debtor

filed the bankruptcy petition for the purpose of "delaying and frustrating" the efforts of its

secured creditors. *Id.* at 1394. The Eleventh Circuit noted that "there is no particular test for

determining whether a debtor has filed a petition in bad faith." *Id.* Rather, "courts may consider

any factors which evidence an intent to abuse the judicial process and the purposes of the

reorganization provisions or, in particular, factors which evidence that the petition was filed to

delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *Id.* (internal

quotations omitted). The bankruptcy court identified the following factors evidencing the

debtor's bad faith:

> (i) The Debtor has only one asset, the Property, in which it does not hold
> legal title;
> (ii) The Debtor has few unsecured creditors whose claims are small in
> relation to the claims of the Secured Creditors;
> (iii) The Debtor has few employees;
> (iv) The Property is the subject of a foreclosure action as a result of
> arrearages on the debt;
> (v) The Debtor's financial problems involve essentially a dispute between
> the Debtor and the Secured Creditors which can be resolved in the pending
> State Court Action; and
> (vi) The timing of the Debtor's filing evidences an intent to delay or
> frustrate the legitimate efforts of the Debtor's secured creditors to enforce
> their rights.

*Id.* at 1394-95.

Since *Phoenix Piccadilly* was decided, Congress added the definition of "single asset real

estate" to § 101(51B) in the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394. This

addition evidences Congress's intent that single asset real estate cases be allowed to proceed in

chapter 11, if on an abbreviated track due to the limited automatic stay provision in § 362(d)(3).

*See In re McGrath*, No. 3:20-BK-3689-RCT, 2021 WL 2405722, at *4 (Bankr. M.D. Fla. June

10, 2021) ("Indeed, much of the judicial resistance to 'single asset real estate' cases represented

in *Phoenix Piccadilly* went by the wayside with the enactment of express provisions in the Bankruptcy Code recognizing 'single asset real estate' ("SARE") cases."). The filing of a chapter 11 case by a single asset real estate debtor is not, by definition, a bad faith filing, because § 362(d)(3) contemplates that such filings will occur. *See In re LCGI Fairfield, LLC*, 424 B.R. 846, 851 (Bankr. N.D. Cal. 2010).

Nevertheless, the *Phoenix Piccadilly* factors remain "appropriate guidelines for consideration when evaluating whether a Chapter 11 petition in a single asset real estate case was filed in bad faith." *In re State St. Houses, Inc.*, 356 F.3d 1345, 1347 (11th Cir. 2004). But "[t]he factors are not exhaustive and should not be rigidly applied." *In re La Trinidad Elderly LP SE*, 627 B.R. 779, 801 (B.A.P. 1st Cir. 2021). Missing from the list of factors is any mention of the debtor's prospects of reorganization. Most courts considering a debtor's good faith, or lack thereof, focus on whether the debtor has a "legitimate possibility of reorganization," even if that possibility is remote. *See, e.g.*, *In re Colbran, LLC*, 475 B.R. 289, 294 (Bankr. D. Mass. 2012) (collecting cases).

The Court agrees that most or all of the *Phoenix Piccadilly* factors are present in this case. However, heavy, if not dispositive, weight should be given to the possibility of reorganization and whether the debtor has sufficient income to operate its business. At the end of the day, the test of a debtor's good faith is whether there was a legitimate purpose to filing the bankruptcy other than frustrating and delaying creditors. Many debtors delay filing a bankruptcy petition until irreversible harm is imminent, such as the eve of foreclosure. That a debtor waited so long is not evidence of bad faith. *See In re U.S.A. Parts Supply*, 619 B.R. 619, 626 (Bankr. N.D.W. Va. 2020). It matters more whether the debtor can make a case for reorganization.

Here, the parties dispute whether the Debtor can reorganize and whether its income will be sufficient to fund business operations in both the near and far future. But the case is not hopeless, and the Court cannot find that there is *no* possibility of reorganization. The Debtor here has an operating business that is earning enough revenue to pay employees and keep the lights on, at least for now. Even a debtor with a slim chance of a successful reorganization does not file in bad faith simply because creditors must wait while the bankruptcy case plays out. The Court concludes that Kraemer Brothers has not carried its burden to prove that the case was not filed in good faith.

### III.

With respect to the question of the Debtor's eligibility to proceed under subchapter V of chapter 11, this case involves a novel question: whether a debtor whose primary activity was once the business of owning single asset real estate can change the nature of its single asset real estate property by purchasing assets of its lessee and assuming the lessee's business operations mere hours before filing its bankruptcy petition. The Court holds that the Debtor has not carried its burden to prove that its primary activity on the Petition Date was not the business of owning single asset real estate. Accordingly, the Debtor is not eligible to be a debtor under subchapter V.

Subchapter V of chapter 11 was added to the Bankruptcy Code by the Small Business Reorganization Act and was effective on February 19, 2020. Subchapter V has strict eligibility rules. A debtor under subchapter V must be

> a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1

or more affiliates or insiders) not less than 50 percent of which arose from
the commercial or business activities of the debtor.

11 U.S.C. § 1182(1)(A).[4]  There are other exclusions from the definition not applicable in this

case.  *See id.* § 1182(1)(B).  For present purposes, there are four eligibility requirements that

must be met for a debtor to be eligible under subchapter V: (1) the debtor must be engaged in

commercial or business activities, (2) the debtor's total debts cannot exceed $7.5 million, (3) not

less than 50 percent of the debts must have arisen from the debtor's commercial or business

activities, and (4) the debtor's primary activity must something other than the business of owning

single asset real estate.  *Id.* § 1182(1)(A).

There is no dispute that the Debtor was engaged in commercial or business activities on

the Petition Date, that the Debtor's relevant debts do not exceed $7.5 million, or that the debts

arose from the Debtor's commercial or business activities.  The dispute here is whether, as of the

Petition Date, the Debtor's primary activity was the business of owning single asset real estate.

Before addressing the merits of that dispute, the Court must address a preliminary but

dispositive issue:  who bears the burden of proof.  The parties appear to agree that the Debtor

bears the burden of proof, but the issue is not so easy.  The parties have not cited, and the Court

has not found, any cases addressing a debtor's eligibility to proceed under subchapter V where

the decisive issue is whether the debtor's primary activity is the business of owning single asset

real estate.

---

[4] When subchapter V was initially added to the Bankruptcy Code, eligibility was limited to debtors that qualified as
a "small business debtor" under 11 U.S.C. § 101(51D).  Under the Coronavirus Aid, Relief, and Economic Security
Act, Pub. L. No.116-136, § 1113, 134 Stat 281 (2020), (the "CARES Act"), Congress moved the definition of a
"debtor" for purposes of eligibility to elect to proceed under subchapter V to § 1182(1), and raised the debt limit of
debtors that are eligible to elect subchapter V to $7.5 million.  Congress did not raise the debt limit for purposes of
defining small business debtors under § 101(51D).  The CARES Act became effective March 27, 2020, and expired
on March 27, 2022.

There is, however, a body of case law outside of the subchapter V context in which courts have addressed whether a property is single asset real estate.[5]  Many of the cases cited most often do not assign a burden of proof.  *See, e.g.*, *In re Scotia Pac. Co., LLC*, 508 F.3d 214 (5th Cir. 2007); *In re Whispering Pines Estate, Inc.*, 341 B.R. 134 (Bankr. D.N.H. 2006); *In re Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. 228, 229 (Bankr. D. Neb. 2000); *In re Kkemko, Inc.*, 181 B.R. 47, 51 (Bankr. S.D. Ohio 1995).  The cases that do discuss the burden of proof generally assign the burden to the moving party, usually a creditor.  *See, e.g., In re Alvion Properties, Inc.*, 538 B.R. 527, 532 (Bankr. S.D. Ill. 2015) ("The moving party bears the burden of proving – by a preponderance of the evidence – that a debtor is subject to the SARE provisions of the Bankruptcy Code.").

The Court is not persuaded that the cases assigning the burden of proof to the moving party are applicable here.  The Court reaches this conclusion for two reasons.  First, most of the cases addressing the burden of proof in single asset real estate cases cite *In re TTM MB Park, LLC*, No. 12-00174, 2012 WL 844499, at *1 (Bankr. S.D. Ala. Mar. 12, 2012), or *In re Hassen Imports P'ship*, 466 B.R. 492, 507 (Bankr. C.D. Cal. 2012).  The Court finds neither case persuasive on this point.  In *TTM MB Park*, the court declared that "[t]he burden of proving that the [debtor qualifies for a SARE designation] is on the moving party, Capmark, by a preponderance of the evidence."  2012 WL 844499, at *1.  The only citation for that proposition is a Seventh Circuit case discussing the preponderance of the evidence standard of proof.  *Id.*

---

[5] The import of these decisions is the application of 11 U.S.C. § 362(d)(3).  That section is intended to expedite a single asset real estate case by requiring the court to grant relief from the automatic stay unless within 90 days the debtor files a feasible plan of reorganization or commences payments to the secured creditor.  *See Collier on Bankruptcy* ¶ 362.07 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("Section 362(d)(3) attempts to shorten such cases by requiring that the court grant relief from the stay if a reasonable plan is not filed promptly or payments are not commenced.").

(citing *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 507 (7th Cir.2007)). The court gave no other rationale for assigning the burden of proof to the moving party.

Similarly, in *Hassen Imports*, the court stated, "[t]he City, as movant, bears the burden of demonstrating that the properties constitute a single project." 466 B.R. at 507. Three cases are cited for that proposition. The first assigned the burden of proof to the debtor as moving party in a lien avoidance dispute. *In re Meeks*, 349 B.R. 19, 21 (Bankr. E.D. Cal. 2006). A debtor's attempt to avoid a lien is very different from whether a property should be characterized as single asset real estate. The second case did involve a single asset real estate issue, but the court simply stated that the creditor sustained its burden on issue without further discussion of its reasoning for its conclusion that the creditor bore the burden. *In re Charterhouse Boise Downtown Properties, LLC*, No. BANKR.07-01199-JDP, 2008 WL 4735264, at *1 (Bankr. D. Idaho Oct. 24, 2008).[6] In the third case, the court held that a creditors committee bore the burden for its motion requesting that its members be permitted to take certain actions without violating their duties to the debtor and the committee, which is a very different issue than determination whether a property is single asset real estate. *In re PG&E, Co.*, 2001 Bankr. LEXIS 2195, *2 (Bankr. N.D. Cal. July 26, 2001).

Moreover, the importance of a single asset real estate designation – other than prohibiting a chapter 11 debtor from proceeding under subchapter V – lies in 11 U.S.C. § 362(d)(3), which addresses motions for relief from stay where the property is single asset real estate. Section 362(g) explicitly instructs that moving party under § 362(d) bears the burden only with respect to "the issue of the debtor's equity in property"; the party opposing relief from stay (generally the

---

[6] In *In re ENKOGS1*, LLC, 626 B.R. 860 (Bankr. M.D. Fla. 2021), the court similarly stated that the creditor did not meet its burden to establish that the hotel-operator debtor "fails to provide services other than those incidental to renting hotel rooms" without analysis as to why the creditor bore the burden. *Id.* at 863 (emphasis omitted).

debtor) "has the burden of proof on all other issues."  11 U.S.C. § 362(g).  This language

indicates that in a motion under § 362(d)(3) where there is a dispute as to whether the property is

single asset real estate, the debtor would bear the burden to prove that the property should not be

so characterized.  *E.g.*, *In re Rear Still Hill Rd., LLC*, No. 07-31556 (LMW), 2007 WL 2935483,

at *4 (Bankr. D. Conn. Oct. 5, 2007) (noting that "the Debtor bears the burden of proof on this

element [single asset real estate characterization] under Bankruptcy Code § 362(g)(2)").

Second, the general rule is that "[t]he burden of establishing eligibility in bankruptcy lies

with the party filing the bankruptcy petition."  *In re Montgomery*, 37 F.3d 413, 415 (8th Cir.

1994); *see also In re Lombard Pub. Facilities Corp.*, 579 B.R. 493, 500 (Bankr. N.D. Ill. 2017)

("A debtor bears the burden of establishing its eligibility to be a debtor under Code section

109.").  Most courts that have addressed eligibility issues under subchapter V similarly have

concluded that the debtor bears the burden of proving eligibility to proceed under subchapter V.

*See, e.g.*, *In re Blue*, 630 B.R. 179, 187 (Bankr. M.D.N.C. 2021) ("This Court agrees with those

courts concluding that the debtor bears the burden of proof to establish eligibility to proceed

under subchapter V."); *In re Rickerson*, No. 21-10315-TPA, 2021 WL 5905974, at *4 (Bankr.

W.D. Pa. Dec. 14, 2021) ("It has generally been held that the burden of proof in establishing

eligibility for bankruptcy relief lies with the party filing the bankruptcy petition.").  *But see In re*

*Body Transit, Inc.*, 613 B.R. 400, 409 at n. 15 (Bankr. E.D. Pa. 2020) (placing burden of proof

on party objecting to debtor's eligibility under subchapter V).[7]

---

[7] The court's conclusion that the objecting creditor bore the burden seems to have been based on a general principle that a movant bears the burden of proof in the absence of a contrary rule or statute.  *Body Transit*, 613 B.R. at 409 at n.15.  Applying that logic, the debtor would never bear the burden to establish eligibility; that burden would always fall to the objecting party.  As the party ultimately seeking relief from the bankruptcy court, it is properly a debtor's burden to prove that it is eligible to obtain relief under a particular chapter (or subchapter) of the Bankruptcy Code.

The Court holds that the Debtor bears the burden to prove each element of its eligibility to be a debtor under subchapter V of chapter 11, including that its primary activity is not the business of owning single asset real estate.  It is admittedly a bit awkward to require a debtor to essentially prove a negative – that is, to prove that the debtor's primary activity is *not* the business of owning single asset real estate.  But the Bankruptcy Code is full of eligibility requirements that require proof of a negative.  For example, a chapter 7 debtor, if challenged, must prove that the debtor is not a railroad, insurance company, or bank, 11 U.S.C. § 109(b); a chapter 13 debtor must prove that he or she is not a stockbroker or commodity broker, *id.* § 109(e); and an individual or family farmer must prove that within the 180 days preceding the petition he or she did not request and obtain voluntary dismissal of a case following the filing of a request for relief from the automatic stay, *id.* § 109(g)(2).  Subchapter V itself contains several other exclusions in § 1182(1)(B).

Assigning the Debtor the burden to prove that its primary activity on the Petition Date was not the business of owning single asset real estate is particularly appropriate given the specific facts of this case.  The Debtor has essentially admitted that its primary activity before the Petition Date was the business of owning single asset real estate.  *See, e.g.*, ECF No. 59 ("The Debtor provides many services that on a pre-petition basis were performed by its affiliate, 94 North, LLC, but which it has undertaken, along with the ownership of the operating assets, post-petition."); ECF No. 86 at 8 ("Before August 16, 2021, the Debtor . . . had no income, potential or actual, arising from sources other than its leasehold income owed by 94 North.").  It is therefore up to the Debtor to prove that its property no longer qualified as single asset real estate when the Debtor filed its bankruptcy petition and elected to proceed under subchapter V.

A second threshold question is the relevant time at which the determination regarding eligibility for subchapter V should be made.  The parties agree that the determination is made by reference to the circumstances that existed on the petition date.  *See* ECF No. 86 at 6-7; ECF No. 92 at 3-4.  All the relevant case law regarding subchapter V eligibility supports the conclusion that a debtor must meet the eligibility requirements on the petition date.  *E.g.*, *In re Blue*, 630 B.R. 179, 189 (Bankr. M.D.N.C. 2021) ("[T]he term 'engaged' as used in § 1182(1)(A) requires debtors to be presently participating in business or commercial activities as of the petition date."); *In re Ikalowych*, 629 B.R. 261, 280 (Bankr. D. Colo. 2021) ("[I]t stands to reason that the Court must look at the then-present state of things as of the Petition Date."); *In re Johnson*, No. 19-42063-ELM, 2021 WL 825156, at *6 (Bankr. N.D. Tex. Mar. 1, 2021) ("the 'engaged in' inquiry is inherently contemporary in focus instead of retrospective, requiring the assessment of the debtor's current state of affairs as of the filing of the bankruptcy petition").

The Court must now determine whether the Debtor's primary activity on the Petition Date was the business of owning single asset real estate.  The term "single asset real estate" is defined in section 101(51)(B) of the Bankruptcy Code and means

> real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

11 U.S.C. § 101(51)(B).  This definition reveals three requirements for property to be single asset real estate: (1) real property constituting a single property or project, (2) that generates substantially all of the gross income of the debtor, and (3) on which no substantial business is conducted other than the business of operating the real property and activities incidental thereto. *See In re Scotia Pac. Co., LLC*, 508 F.3d 214, 220 (5th Cir. 2007).

The first prong of the definition is met because there is no dispute that the real estate at issue is a single property or project.

The second prong of the definition requires that the real property generates "substantially all" of the income of the debtor.  The Debtor agrees that, before the Petition Date, "it had no income, actual or potential, arising from sources other than its leasehold income owed by 94 North."  ECF No. 86 at 8.  The Debtor argues that on and after the Petition Date, it had income other than from its leasehold with 94 North.  But the Debtor did not identify any income it received either on the Petition Date or in the days that followed.

Mr. Tomaska testified that the theater box office was open on the Petition Date and is generally open every day.  He also testified that tickets can be sold any time through the theater's website.  However, he did not testify as to which entity received the revenue of those ticket sales or which entity supplied the employees that ran the box office.  No funds from those ticket sales were deposited in the Debtor's debtor-in-possession bank account.  Rather, it appears that all the income from ticket sales in August 2021 was deposited in a bank account owned by 94 North. *Compare* ECF No. 40 at 15-17 (debtor-in-possession bank statement reflecting just three deposits in August 2021) *with* ECF No. 40 at 22-27 (94 North bank statement reflecting near daily deposits from a payment processing service).  Moreover, Mr. Tomaska testified that the theater's ticket vendor is tix.com, and that the contract with tix.com is in the name of 94 North. The Debtor has not carried its burden to prove that on the Petition Date it had income from any activities other than operating the real estate.

The third prong of the single asset real estate definition is whether no substantial business is conducted other than the business of operating the real property and activities incidental thereto.  The Debtor argues that the theater in this case is akin to a golf club or full-service hotel,

which courts have generally held are not single asset real estate. *See, e.g.*, *In re Whispering Pines Estate, Inc.*, 341 B.R. 134, 136 (Bankr. D.N.H. 2006) (full-service hotel is not single asset real estate); *In re Prairie Hills Golf & Ski Club, Inc.*, 255 B.R. 228, 230 (Bankr. D. Neb. 2000) (golf club is not single asset real estate).

The problem is that the debtors in those cases actually engaged in the additional business activities the courts found dispositive, such as running a pro shop, renting carts, collecting green fees, cleaning hotel rooms, and selling food and beverages. The Debtor here did none of that. By the Debtor's own admission, 94 North ran all aspects of the theater until just hours before the petition was filed. *See* ECF No. 59 at 4. The Court therefore considers only the Debtor's activities after the Purchase and Sale Agreement was signed and the "hospitality" assets and operations were transferred to the Debtor.

In its pre-hearing brief, the Debtor identified the following activities it engaged in on the Petition Date before the petition was filed: "completion of inventory and transfers thereto, advising employees, advising the firms shared CPA of its decisions for tax purposes, directions given to insurers, applications for permits and licenses." ECF No. 86 at 9. However, at the hearing, the only evidence of business activities conducted by the Debtor was Mr. Tomaska's testimony that he informed the theater staff on the Petition Date that "everything then on would be under purview of [the Debtor]." There was also some testimony regarding the Debtor's attempt to obtain a liquor permit.[8]

---

[8] The parties spent significant time in their written submissions and at the January 28, 2022 hearing on the question whether the Debtor had authority to serve food and beverage at the theater on the Petition Date. This issue is irrelevant to the Court's determination. Mr. Tomaska credibly testified that he consulted the local authorities regarding the liquor license for the theater and was advised that the Debtor could serve liquor after the Petition Date notwithstanding that the liquor license for the theater was in the name of 94 North. Moreover, it is undisputed that the Debtor served no liquor, or any other food or beverage, on the Petition Date or until August 20, 2021.

Aside from talking with staff and addressing a permit issue, little evidence was presented as to what other business activities *the Debtor*, as opposed to 94 North, undertook on the Petition Date or on the days that followed.  Mr. Tomaska testified that the theater box office was open every day, but the only evidence as to which entity was staffing the box office – the Debtor or 94 North – was Mr. Tomaska's oblique reference to the Debtor (he used the term "Palace") running the operations of the theater after the Petition Date.  Mr. Tomaska also testified that all the revenue received after the Petition Date "went into the debtor in possession."  This testimony is plainly contradicted by the Debtor's monthly operating reports, which indicate that the operating revenue was deposited into an account held by 94 North.  It is also unclear why or how the Debtor would be handling ticket sales when it did not hold the contract with the ticket vendor, it did not hold the contracts with the performers, and all ticket revenue was deposited into an account owned by 94 North.

Mr. Tomaska referred to the food and beverage operations, but he did not specify what activities were conducted on the Petition Date or the days that followed.  Crediting Mr. Tomaska's testimony that the bar and concession was open during the Bello Nock show on August 20 (which is contradicted by the Debtor's Exhibit 102 that shows no bar and concession revenue during the Bello Nock shows) and that the Debtor (as opposed to 94 North) operated the bar and concession that day, August 20 is the first day for which there was evidence that the Debtor engaged in any business activity other than owning the real estate.  The Debtor did not, for example, present evidence that it conducted any food and beverage business activity between August 16 and August 19 other than a call to a permitting office.  Therefore, the Court has no evidence from which it can conclude that on the Petition Date the Debtor conducted any business activities other than the business of operating the real property and activities incidental thereto.

On the Petition Date, the Debtor had done no more than acquire the "hospitality" assets from 94 North, which it hoped to use for business activities in the future.  At least one court has cautioned against consideration of a debtor's plan for future business activities:

> The use of the present tense by Congress in § 101(51B) suggests that only current activities may be considered in determining whether the debtor is conducting substantial business activities other than the operation of the property. Any other conclusion would allow all debtors with unrented commercial space to evade § 362(d)(3) by simply declaring an intention to start a business.

*In re CBJ Dev., Inc.*, 202 B.R. 467, 473 (B.A.P. 9th Cir. 1996).  The facts of this case are somewhat different than those the *CBJ Development* court cautioned against, because hospitality assets were not sitting idle for a long period of time either before or after the Petition Date.  But Debtor also did not immediately use the assets to conduct business activity such that the Court can say they were in use by the Debtor when the petition was filed.

This case also presents the very unusual situation of a debtor that claims to have purchased assets to conduct additional business activity on property that was single asset real estate but did not take steps separate its business from that of the seller of those assets.  At bottom, the maneuver in this case seems to have been designed to evade the single asset real estate exclusion in subchapter V.[9]  While some measure of pre-bankruptcy planning is allowed by the plain terms of the Bankruptcy Code, the Court cannot condone the Debtor's attempt to make it appear as though it was conducting additional business on the Petition Date.

Finally, the Debtor makes a passing suggestion that it was the alter-ego of 94 North before the Petition Date, which would allow it to evade the single asset real estate designation.

---

[9] The Debtor repeatedly argued that the theater is just the sort of business subchapter V was intended to benefit. That may be so, but Congress determined that debtors with single asset real estate are not eligible to take advantage of subchapter V.  It is not for the Court to question that determination.

ECF No. 86 at 8.  The Court will not address this suggestion.  The Debtor has admitted that it

had no operations or income other than owning the property before the Petition Date, and the

Debtor devoted no portion of its brief or oral argument to an alter ego theory.  There is evidence

that the Debtor and 94 North commingled their finances both before and after the Petition Date,

but 94 North did not file bankruptcy.  Without any argument as to the significance of that

"commingling" on the single asset real estate determination, the Court will consider only the

evidence related to the Debtor's activities.  That evidence indicates that the Debtor's primary

business on the Petition Date was owning single asset real estate.  Accordingly, the Debtor is not

eligible to be a debtor under subchapter V of chapter 11.

## **<u>ORDER</u>**

For the foregoing reasons,

IT IS HEREBY ORDERED that Kraemer Brothers' motion to convert this case to one

under chapter 7 is DENIED.

IT IS FURTHER ORDERED that Kraemer Brothers' objection to the Debtor's

subchapter V election is SUSTAINED.  Effective as of this date, the Debtor must now proceed

as a regular chapter 11 debtor.

IT IS FURTHER ORDERED that subchapter V trustee William Wallo is discharged.

# # #